**Opinion filed July 12, 2012**



In The

# Eleventh Court of Appeals

_____

## No. 11-12-00070-CV

_____

## IN THE INTEREST OF A.W.C. AND G.A.C., CHILDREN

**On Appeal from the 106th District Court**
**Dawson County, Texas**
**Trial Court Cause No. 11-03-18547**

## M E M O R A N D U M   O P I N I O N

After a bench trial, the trial court entered an order terminating the parental rights of the mother and father of A.W.C. and G.A.C.[1]  The children's mother (Connie) and father (Antonio) have each filed a notice of appeal.  We affirm.

### Issues

Connie presents three points of error for review, and Antonio presents eight issues for review.  All of the points of error and issues involve challenges to the sufficiency of the evidence to support termination of Connie's and Antonio's parental rights.  In her points of error, Connie contends that the evidence was legally and factually insufficient to support the trial court's findings (1) that she constructively abandoned the children while they were in the temporary conservatorship of the Department of Family and Protective Services (the Department); (2) that

---

[1]In some parts of the record, the children are referred to as A.W.C., Jr. and G.A.S.C.

she failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of her children; and (3) that, because the Department made reasonable efforts to return the children to her, termination based on her alleged mental illness or deficiency was not supported by the evidence. In his issues, Antonio contends that the evidence was legally and factually insufficient to support the trial court's findings (1) that he constructively abandoned the children while they were in the temporary conservatorship of the Department (Issues 1 and 2); (2) that he failed to comply with the provisions of a court order that specifically established the actions necessary for him to obtain the return of his children (Issues 3 and 4); (3) that termination of his parental rights was in the best interest of the children (Issues 5 and 6); and (4) that, because the Department made reasonable efforts to return the children to him, termination based on his alleged mental illness or deficiency was not supported by the evidence (Issues 7 and 8).

*Legal and Factual Sufficiency*

Termination of parental rights must be supported by clear and convincing evidence. TEX. FAM. CODE ANN. § 161.001 (West Supp. 2011). To determine if the evidence is legally sufficient in a parental termination case, we review all of the evidence in the light most favorable to the finding and determine whether a rational trier of fact could have formed a firm belief or conviction that its finding was true. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). To determine if the evidence is factually sufficient, we give due deference to the finding and determine whether, on the entire record, a factfinder could reasonably form a firm belief or conviction about the truth of the allegations against the parent. *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002).

To terminate parental rights under Section 161.001, it must be shown by clear and convincing evidence that a parent has committed one of the acts listed in Section 161.001(1)(A)–(T) and that termination is in the best interest of the child. Section 161.001. In this case, the trial court found that the parents committed two of the acts listed in Section 161.001(1). Specifically, the trial court found that Connie and Antonio had:

> [1] constructively abandoned the children who have been in the permanent or temporary managing conservatorship of the [Department] for not less than six months and: (1) the [Department] has made reasonable efforts to return the children to the [parent]; (2) the [parent] has not regularly visited or maintained significant contact with the children; and (3) the [parent] has demonstrated an inability to provide the children with a safe environment; [and]

2

[2] failed to comply with the provisions of a court order that specifically established the actions necessary for the [parent] to obtain the return of the children who have been in the permanent or temporary managing conservatorship of the [Department] for not less than nine months as a result of the children's removal from the parent under Chapter 262 for the abuse or neglect of the children.

*See* Section 161.001(1)(N), (O). The trial court also found that termination of Connie's and Antonio's parental rights was in the children's best interest. *See* Section 161.001(2).

A trial court may order termination of parental rights under TEX. FAM. CODE ANN. § 161.003 (West 2008) when it is shown, and the trial court finds, that:

(1) the parent has a mental or emotional illness or a mental deficiency that renders the parent unable to provide for the physical, emotional, and mental needs of the child;

(2) the illness or deficiency, in all reasonable probability, proved by clear and convincing evidence, will continue to render the parent unable to provide for the child's needs until the 18th birthday of the child;

(3) the department has been the temporary or sole managing conservator of the child of the parent for at least six months preceding the date of the hearing on the termination held in accordance with Subsection (c);

(4) the department has made reasonable efforts to return the child to the parent; and

(5) the termination is in the best interest of the child.

*See* Section 161.003(a)(1)–(5). In this case, the trial court made the findings required for termination under Section 161.003.

The record shows that, on February 26, 2011, the Department received a report that Connie and Antonio were neglecting A.W.C. and G.A.C. At that time, A.W.C. was nineteen months old, and G.A.C. was five months old. The Department received information that Antonio had called friends in Lamesa because he and Connie were being evicted from their residence in New Mexico; that Antonio had requested his friends to come to New Mexico and then bring him, Connie, and the children to Lamesa; that, when Antonio and Connie and the children were picked up in New Mexico and later arrived in Lamesa, the children "were dirty and smelled" and Antonio and Connie "had body odor as well"; that Antonio and Connie did not

3

have any formula for G.A.C.; that Antonio and Connie were giving both children regular milk to drink; and that the bottles the children were drinking from "were crusty and filthy."

Kimberly Masters, an employee of the Department, was the conservatorship caseworker assigned to this case. Masters testified that, after the Department received the neglect report, an investigator for the Department made contact with Antonio, Connie, and the children. The record showed that this contact occurred on March 1, 2011. At that time, the children were very dirty, and Antonio and Connie were also dirty. The investigator discovered that Antonio and Connie were giving both children two percent milk. On the same day, the Department removed the children from the care of Antonio and Connie. The Department placed A.W.C. and G.A.C. in foster care with Lino and Holly Garcia. The children were still in the Garcias' care at the time of trial. The Department's initial goal in the case was to reunify the children with Antonio and Connie, but later, the Department's goal became adoption by the Garcias.

Masters testified that A.W.C. and G.A.C. were not current on their immunizations when they were removed from Antonio and Connie. Masters also testified about the condition of the children at the time of removal. She said that G.A.C. was developmentally delayed, was not eating properly, and had intestinal problems. Masters said that A.W.C. was also developmentally delayed. She said that A.W.C. had problems with his speech. Masters explained that A.W.C. did not say any words and that his mode of communication consisted of "mainly grunts." She also said that A.W.C. was very small and did not have hand/eye coordination.

Holly Garcia testified that she was married to Lino Garcia. Holly testified that A.W.C. and G.A.C. came to live with Lino and her on March 1, 2011, and had continually lived with them since that time. The Garcias had one other foster child, a three-month-old girl. Holly testified that she was a stay-at-home mom.

Holly testified that A.W.C. and G.A.C. were both sick when they came to live with her. The Garcias took the children to doctor's appointments, where the Garcias learned that both children had sinus infections and double ear infections. Holly also testified that both children were "small" when they were placed in her care. She learned at the children's doctor's appointments that both children were in the fifth percentile. While in the care of the Garcias, the children were brought current on their immunizations.

Holly said that A.W.C. was developmentally delayed in his speech when he came to live with her. She said that he had a very limited vocabulary. After being placed in the Garcias'

4

care, A.W.C. attended speech therapy once a week and occupational therapy twice a week. Holly said that A.W.C. was almost finished with speech therapy and that he "talk[ed] all the time now." She also said that A.W.C. was progressing well in occupational therapy and would be attending "a little more occupational therapy just to learn some more motor skills." A.W.C. did not eat very much when he came to live with the Garcias. At that time, A.W.C. was still on a bottle, and it took about a month to get him to consistently eat solid food. Holly was informed that G.A.C. had been on whole milk before she was removed from Antonio's and Connie's care. Holly said that G.A.C. "had a lot of stomach issues" at first and that it took "a little while to get her stomach regulated."

Holly testified that both children "like[d] to eat [and were] healthy" and that the children were "growing and thriving." Holly said that, at the time of trial, A.W.C. was "almost past the 12th percentile" and G.A.C. was "already in the 72nd percentile." Holly testified that, at the time of trial, A.W.C. and G.A.C. were happy, healthy, and stable kids. Holly said that she and her husband loved A.W.C. and G.A.C. and wanted to adopt them.

The record shows that the Department removed another child from Antonio's and Connie's care in 2008. Antonio and Connie voluntarily terminated their rights to this child.

Antonio and Connie both received monthly disability checks. Antonio received monthly checks in the amount of $681 and $175. Connie received a monthly check in the amount of $175. Antonio had never been employed, and Connie had not been employed during the pendency of this case. Neither Antonio nor Connie had a driver's license or drove a car.

Antonio and Connie had a house in Lamesa when they lived in New Mexico. The record is not clear as to whether they owned the house. Antonio and Connie lived in this house at the time of trial. When Antonio and Connie arrived in Lamesa from New Mexico, their house in Lamesa was unlivable. It had no electricity or running water. Antonio and Connie lived in a motel for a lengthy period of time. Masters testified that, when she first saw Antonio and Connie's house, it was "run down." Masters explained that "[she] could see through the floor, through the ceiling, windows were broken, [and] walls needed to be repaired." Hollie Price testified that she was the Court Appointed Special Advocate (CASA) and guardian ad litem for A.W.C. and G.A.C. Price visited Antonio and Connie's home shortly after the children were removed from their care. At that time, Antonio and Connie did not live in the house. Price described the condition of the house at that time as "dirty, [and] almost unlivable." Price also

5

said that the house had holes in the floors and broken windows and that the house did not have electricity or running water.

Masters said that, later in the case, members of a church remodeled Antonio and Connie's house. Masters saw the house two or three weeks before trial. She said that, although the physical condition of the house was "fine" at that time, "[the home] had gone back downhill." She said that the house was dirty again and that wind was blowing through windows in the house.

Chris Powell testified that he was the senior pastor at First Baptist Church in Lamesa. He said that, in July 2011, volunteers from his church rewired, replumbed, painted, and cleaned Antonio and Connie's house in Lamesa. The volunteers also made cosmetic repairs to the house. They patched but did not replace broken windows in the house. Powell said that the church provided Antonio and Connie with a washer and dryer, a stove, a refrigerator, a bed, a couch, and some other items. Powell testified that the house was not in a livable condition before the volunteers worked on it. He said that it would have concerned him for children to be in the house in its former condition.

After the children were removed from Antonio and Connie, court-ordered service plans were put into place. Antonio and Connie were required to comply with the terms of their respective service plans, which established the actions necessary for them to obtain the return of A.W.C. and G.A.C. *See* Section 161.001(O). As required by the plans, Antonio and Connie both completed psychological evaluations with William E. Hoke, Ph.D. The Department introduced copies of Dr. Hoke's reports of the evaluations into evidence as State's Exhibit No. 1. Dr. Hoke determined that Antonio, who was forty-nine years old, had a full-scale IQ of 51. Dr. Hoke diagnosed Antonio with moderate mental retardation. Based on his examination of Antonio, Dr. Hoke concluded in his report as follows:

> Overall, these results are consistent with severe and chronic mental retardation which will have a major impact upon his ability to be an appropriate father. [Antonio] certainly is unable to care for himself and will require structure and supervision throughout the remainder of his life. It is likely that his wife, [Connie] spends much of her time in taking care of many of his needs. He will not be able to live independently and will certainly be unable to provide an appropriate or safe home for his children. Although he seems to love them and is somewhat attached to them, his limitations will place the children at risk for harm.

Recommendations include [Antonio] continuing with the Plan of Service as prescribed by CPS. This should include parenting classes, a clean and appropriate living arrangement, and any other services deemed appropriate. If he is able to receive the assistance he requires, his long-term prognosis may be slightly improved. In general, however, his cognitive limitations appear to be severe and are unlikely to improve in the future. As a result, his ability to adequately care for his children appears to be quite limited and it is very likely that they would be in danger were they to be placed with him as a primary paternal figure.

Dr. Hoke determined that Connie, who was twenty-nine years old, had a full-scale IQ of 70. Based on his examination of Connie, Dr. Hoke concluded in his report as follows:

Overall, these results suggest significant limitations in many areas in her life. It appears that she will struggle to provide an appropriate home for herself and will also struggle to provide an appropriate and stable home for her children. Unfortunately, her level of insight into her deficits appears to be very limited and it is likely that she will have a difficult time understanding why anyone might have concerns about her . . . ability to be an appropriate parent.

Recommendations include [Connie] continuing with the Plan of Service as prescribed by CPS. This should include individual counseling, couples counseling, parenting classes, homemaker skills training, family counseling, budgeting classes, and all other services as indicated. If she is able to receive the assistance she requires, her long-term prognosis may be slightly improved. Again, given what appear to be a number of significant limitations, it is likely that [Connie] will struggle in the future to be able to provide an appropriate home for her children, yet may be fairly unaware of her deficits and limitations.

The service plans also required Antonio and Connie to participate in an MHMR assessment and to follow through with all recommendations provided by MHMR. Masters testified that the MHMR services entailed a mental health evaluation and services, financial budgeting classes, parenting classes, and any other necessary life skills classes. The Department included the MHMR services on the service plans so that Antonio and Connie would have an opportunity to learn how to take care of themselves and to manage their money. Additionally, MHMR would help Antonio and Connie obtain necessary medications and any other available disability payments. Masters said that the MHMR services were made available to Antonio and Connie in Lamesa.

Masters testified that the Department scheduled appointments for Antonio and Connie to receive MHMR services on three separate occasions but that Antonio and Connie did not show

up for any of the appointments. A prior caseworker in the case set up the first appointment, and Masters set up the second and third appointments. Masters testified that Anita Carillon, a Department employee, attempted to take Antonio and Connie to the last scheduled appointment but that she could not find them. Masters said that Antonio and Connie told her that they went to an MHMR appointment but that they did not need services and so "MHMR turned them away." Masters contacted MHMR and confirmed that Antonio and Connie missed all the scheduled appointments.

A temporary order provided that Antonio and Connie would have supervised visitation with the children a minimum of two hours every other week at the Department's office closest to the children's foster care placement. The visitations were scheduled to take place in the Department's office in Odessa. Because neither Antonio nor Connie had a driver's license or a car, the Department provided round-trip transportation to them for their visits with A.W.C. and G.A.C. Masters said that, although the Department made transportation available to Antonio and Connie, they only visited A.W.C. and G.A.C. on nine of twenty-four scheduled visits. Masters testified that, before a scheduled visitation, Carillon would go to Antonio and Connie's house and, if they were not home, would then go to places where they often went, such as convenience stores and restaurants, to look for them. On most occasions, Carillon could not find Antonio and Connie. Masters said that, the week before trial, Antonio and Connie visited the children for the first time in four months.

Connie testified that she had been getting disability checks since she was five years old. Connie said that she was put in special education classes while in school. However, she said that, "knowing how smart [she was]," she had no idea why she was placed in special education classes. Connie also said that she had gone to school through the tenth grade.

Connie testified that she and Antonio went to MHMR. She said that they "made the appointments on [their] own." Connie said that she talked to a psychiatrist and a caseworker by videoconference at MHMR. She testified that, at MHMR, "he" wanted to give her shots because she was anemic. Connie said that she did not "want to take no shots." Connie said that, at MHMR, she was told that the only way she could take classes was to take medication. Connie said that, a long time ago, a doctor diagnosed her with schizophrenia. Connie testified that she used to take medication for her schizophrenia but that "God ha[d] taken away [her] mental illness." She said that she had promised God that she would not take any more medications and

8

that she could not break her promise to God. She said that "[she had not] taken medication in a long time." However, Connie said that she was currently taking medication for mood swings relating to her going through menopause.

With respect to missing visitation periods with the children, Connie said that she and Antonio did not hear Carillon knock on the door if Carillon came to their house to take them to the visits. Connie said that Carillon tried to make her look bad and "made [them] miss out on seeing the babies." Connie also said that A.W.C. and G.A.C. were not sick when they were removed from her care. Connie testified that she was capable of taking care of the children because Antonio taught her how to take care of them.

Connie also testified about the condition of her and Antonio's house. She said that, at the beginning of the case, the house had no electricity. However, she said that a church had put wiring in the house.

Antonio testified that he and his family came back to Lamesa because their landlord in New Mexico had "kick[ed] [them] out." Antonio testified that their house in Lamesa needed to be fixed up "a little bit" when he and Connie moved back to Lamesa from New Mexico. He said that the church helped fix up their house in Lamesa.

Antonio said that A.W.C. and G.A.C. were not sick when they were removed from his care. He does not believe that Carillon came to their house to pick up Connie and him for visits with the children every time that she said she did. Antonio said that he and Connie went to MHMR and that, while there, he did a videoconference with a psychiatrist. He said that a lady at MHMR told him that "you don't need to come here no more."

Norma Rosales testified that she had known Antonio all her life. She said that Antonio babysat her children in 1993. Rosales testified that Antonio was able to take care of her kids.

The evidence, which is summarized above, showed that Antonio's and Connie's service plans required them to participate in an MHMR assessment and to follow through with all recommendations provided by MHMR. Masters testified that the Department made three separate appointments for Antonio and Connie to receive MHMR services but that Antonio and Connie did not attend any of the appointments. Masters confirmed with MHMR that Antonio and Connie missed all their appointments. Antonio and Connie testified that they went to MHMR. The trial court's function, as the trier of fact, was to judge the credibility of the witnesses, assign the weight to be given their testimony, and resolve any conflicts or

9

inconsistencies in the testimony. *In re R.W.*, 129 S.W.3d 732, 742 (Tex. App.—Fort Worth 2004, pet. denied). The trial court was entitled to believe all, part, or none of the testimony of any witness. *In re T.N.*, 180 S.W.3d 376, 382–83 (Tex. App.—Amarillo 2005, no pet.). The trial court was free to believe Masters's testimony and to disbelieve Connie's and Antonio's testimony. Based on the evidence presented at trial, the trial court could reasonably have formed a firm belief or conviction that Connie and Antonio both failed to comply with the court-ordered service plans. Therefore, the evidence is legally and factually sufficient to support termination under Section 161.001(1)(O) of the Texas Family Code.

Connie's second point of error and Antonio's third and fourth issues are overruled. Because only one ground is needed to support a termination order, we need not address Connie's first and third points of error and Antonio's first, second, seventh, and eighth issues challenging the sufficiency of the evidence to support the trial court's findings under Sections 161.001(1)(N) and 161.003 of the Texas Family Code.

In his fifth and sixth issues, Antonio challenges the sufficiency of the evidence to support the trial court's finding that termination of his parental rights was in the best interest of A.W.C. and G.A.C. The focus is on the children's best interest, not that of the parents. *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas, no writ). With respect to the best interest of a child, no unique set of factors need be proved. *In re C.J.O.*, 325 S.W.3d 261, 266 (Tex. App.—Eastland 2010, pet. denied). But, courts may use the non-exhaustive *Holley* factors to shape their analysis. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These include, but are not limited to, (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home of proposed placement, (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent. *Id.* Additionally, evidence that proves one or more statutory grounds for termination may also constitute evidence illustrating that termination is in the child's best interest. *In re C.J.O.*, 325 S.W.3d at 266. A trier of fact may measure a parent's future conduct

by his or her past conduct and determine that it is in the child's best interest to terminate parental rights.  *In re D.S.*, 333 S.W.3d 379, 384 (Tex. App.—Amarillo 2011, no pet.).

The record shows that A.W.C. and G.A.C. were removed from Connie's and Antonio's care on March 1, 2011.  Since that date, the children had been living with the Garcias.  The children had thrived while in the Garcias' care.  The Garcias had provided a stable environment for the children and had met the children's needs.  A.W.C. and G.A.C. had a good relationship with the Garcias, and the Garcias wanted to adopt them.  On the other hand, Connie and Antonio had not exhibited adequate parenting abilities in the past.  The evidence demonstrated that they could not provide A.W.C. and G.A.C. a safe and stable home environment or meet their physical and emotional needs.  Further, the evidence showed that Connie and Antonio likely would not be able to sustain a safe and stable environment or to meet the children's needs in the future.  Considering Connie's and Antonio's past conduct, the trial court could have reasonably concluded that Connie and Antonio would not be able to provide the children with a safe and stable environment or to meet their needs in the future.

Based on the evidence, the trial court could reasonably have formed a firm belief or conviction that termination of Connie's and Antonio's parental rights would be in the best interest of A.W.C. and G.A.C.  Therefore, we cannot conclude that the trial court's best interest finding is not supported by clear and convincing evidence.  The evidence is legally and factually sufficient to support the finding that termination of Connie's and Antonio's parental rights is in the best interest of A.W.C. and G.A.C.  Antonio's fifth and sixth issues are overruled.

## This Court's Ruling

We affirm the trial court's order terminating Connie's and Antonio's parental rights to A.W.C. and G.A.C.


TERRY McCALL
JUSTICE

July 12, 2012

Panel consists of: Wright, C.J.,
McCall, J., and Kalenak, J.

11